## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

KORAN CHAMBERS

_____

_____

_____

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-against-

DAVID J. KIRSCHNER; SEAN STEPHEN McNICOLAS;

MAXWELL STEPHEM PILLER, and JOSEPH KEEGAN

_____

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

**Complaint for Violation of Civil Rights**

(Non-Prisoner Complaint)

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial:     ☒ Yes     ☐ No
*(check one)*

## NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed *in forma pauperis*.

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Koran Chambers |
| Street Address | 104-09 189th Street |
| City and County | Saint Albans, Queens |
| State and Zip Code | New York 11412 |
| Telephone Number | (718) 926-3606 |
| E-mail Address | Betterlifechanges1@gmail.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | David J. Kirschner |
| Job or Title (if known) | Queens Co. Criminal Supreme Court Justice |
| Street Address | 125-01 Queens Boulevard, Part K-23 |
| City and County | Kew Gardens, Queens |
| State and Zip Code | New York 11415 |
| Telephone Number | (718) 298-0456 |
| E-mail Address (if known) | dkirschn@nycourts.gov |

2

Defendant No. 2

Name                    Sean Anthony McNicolas

Job or Title            125-16c Queens Boulevard
(if known)

Street Address          Kew Gardens

City and County         Queens, Queens

State and Zip Code      New York 11415

Telephone Number        (718) 261-0033

E-mail Address          seanlawoffice@yahoo.com
(if known)


Defendant No. 3

Name                    Maxwell Stephen Piller

Job or Title            Assistant District Attorney
(if known)              County of Queens

Street Address          125-55 Queens Boulevard

City and County         Kew Gardens, Queens

State and Zip Code      New York 11415-1520

Telephone Number        (718) 286-6000

E-mail Address
(if known)


Defendant No. 4

Name                    Joseph Keegan, Shield No. 17824

Job or Title            New York Ctiy Police Detective
(if known)              113th Precinct, Queens

Street Address          167-02 Baisley Boulevard

City and County         Jamaica, Queens

State and Zip Code      New York 11434

Telephone Number        (718) 712-7733

E-mail Address
(if known)

3

Defendant No. 2

| | |
|---|---|
| Name | Sean Anthony McNicolas |
| Job or Title (if known) | 125-16c Queens Boulevard |
| Street Address | Kew Gardens |
| City and County | Queens, Queens |
| State and Zip Code | New York 11415 |
| Telephone Number | (718) 261-0033 |
| E-mail Address (if known) | seanlawoffice@yahoo.com |

Defendant No. 3

| | |
|---|---|
| Name | Maxwell Stephen Piller |
| Job or Title (if known) | Assistant District Attorney County of Queens |
| Street Address | 125-55 Queens Boulevard |
| City and County | Kew Gardens, Queens |
| State and Zip Code | New York 11415-1520 |
| Telephone Number | (718) 286-6000 |
| E-mail Address (if known) | |

Defendant No. 4

| | |
|---|---|
| Name | Joseph Keegan, Shield No. 17824 |
| Job or Title (if known) | New York Ctiy Police Detective |
| Street Address | 113th Precinct, Queens 167-02 Baisley Boulevard |
| City and County | Jamaica, Queens |
| State and Zip Code | New York 11434 |
| Telephone Number | (718) 712-7733 |
| E-mail Address (if known) | |

3

## II.     Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.     Are you bringing suit against *(check all that apply)*:

      ☒     State or local officials (a § 1983 claim)

      ☐     Federal officials (a *Bivens* claim)

B.     Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

Fourth, Sixth and Fourteenth Amendments prohibiting unlawful searches and seizures, abridging citzen privileges and immunities from fraudulent prosecu-tion, and requiring effective assistance of counsel, which defendant McNicolas deprived me of by allowing defendant Keegan's perjured testimony to go un-challenged. Further, it is not within the purview of defendant Kirschner's judicial immunity to aid and abet perjury, not to preside over a blantantly fraudulent and illegal criminal proceeding, wherein the facts averred in the Fourth Count of the indictment charging Operating a Motor Vehicle with a Tinted Window do not establish the offense charged, nor probable cause for the resulting search and seizure based on the traffic stop. The same applies to defendant Piller for prose-cuting a criminal case he knows and/or should know to be illegal.

D.     Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

The defendants, acting individually and in concert under color of state law, are prosecuting me under Queens Co. Ind. #73253/22, in violation of my right to a preliminary hearing under Sec. 100.05 and Article 180 of the NY CPL, and are knowingly and intentionally allowing me to be prosecuted unpon a jurisdictionally defective indictment obtained by perjured testimony, in violation of the 4th, 6th and 14th Amendments, as I was subjected to an illegal search and seizure due to an illegal traffic stop.

4

**III.    Statement of Claim**

State as briefly as possible the facts of your case.  Describe how each defendant was
personally involved in the alleged wrongful action, along with the dates and locations of
all relevant events.  You may wish to include further details such as the names of other
persons involved in the events giving rise to your claims.  Do not cite any cases or
statutes.  If more than one claim is asserted, number each claim and write a short and
plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

Queens County Criminal Court

125-01 Queens Boulevard

Kew Gardens, New York 11415

B.    What date and approximate time did the events giving rise to your claim(s) occur?

October 19, 2022 through May 2025

C.    What are the facts underlying your claim(s)?  *(For example:  What happened to
you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

On October 19, 2022, Plaintiff was subjected to a traffic stop by defendant
Keegan for driving with window tints, which is not a traffic violation nor a
crime, nor was defendant Keegan on patrol for traffic violations. After the
traffic stop, defedant Keegan noticed that the front license plate to Plaintiff's
vehicle was missing, which Plaintiff explained had fallin off and had in his
possession. The traffic stop turned into an illegal search and seizure resulting
in Plaintiff being arrested for possessing  a firearm. Plaintiff was arraigned
upon an unsworn felony complaint in violation of the 4th and 14th Amendments,
which require an otah or affirmation (the latter of which can be made only by a
prosecuting attorney), and was never informed of nor provided a preliminary
hearing mandated by CPL Article 180, and was illegally indicted in violation
of CPL 100.05 upon the perjured testimony of defendant Keegan, who falsely
testified that he stopped Plaintiff for both tinted windows and a missing front
license plate, the latter being noticed only after, not before the traffic stop (see
attached Certified Transcription of Bodycam; Grand Jury Testimony and
Jursidctionally Defective Indictment).

5

### IV.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Severe mental and emotional trauma, pain and anguish resulting from being illegally arrested and deprived of a mandatory preliminary hearing required under Article 180 of the CPL, resultng in a jurisdictionally defective indictment that was filed in violation of CPL 100.05 and the perjured testimony of defendant Keegan, and in violtion of my rights under the 4th and 14th Amendments. Also, the Fourth Count of the indictment alleging a window tint violation under NY Vehicle and Traffic Law Sec. 375 (12-a and b) does not aver facts constituting the offense charged, in that the facts allege only that a rear window was tinted, which does not constitute a traffic offense and violates Subd. 7(a) of CPL 200.50 .

### V.   Relief

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

I request that the Court award me $250 Million in compensatory and punative damages against the defendants in their individual and official capasities for severe mental and emotional pain, suffering and distress, and for engaging in a criminal conspiracy to deprive me of liberty without due process of law, and for subjecting me to a fraudulant criminal prosecution based upon perjured testimony, an illegal traffic stop, and an illegal search and seizure in violation of my 4th and 14th Amendment rights under the United States Constitution.

### VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

6

**A.**    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    May 21,  , 2025

Signature of Plaintiff _____

Printed Name of Plaintiff    Koran Chambers _____

7

# ATTACHMENTS

# CERTIFIED BODYCAM TRANSCRIPTION

CRIMINAL SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

------------------------X
IN THE MATTER(S) OF:

THE PEOPLE OF THE STATE OF NEW YORK,

                                    Indictment No.
                                    73253-2022

            Vs.

KORAN CHAMBERS,

                    Defendant.
------------------------X

                    October 19, 2022

        Transcript of:  Police Body Cam of Car Stop
            2022-10-19   44-27-0400 9AXON BODY 3

Digital Recording, Transcribed by:
                SONYA LEDANSKI HYDE

            Veritext Legal Solutions
        330 Old Country Road - Suite 300
                Mineola, NY 11501

People of the State of New York / Chambers 10/19/2022          2
PROCEEDINGS

1          OFFICER JOSEPH KEEGAN:  Roll the window down
2     for us?
3          KORAN CHAMBERS:  No, it don't work.
4          OFFICER JOSEPH KEEGAN:  All right, just pop the
5     door, then?
6          KORAN CHAMBERS:  (Inaudible).
7          OFFICER JOSEPH KEEGAN:  How's it going, man?
8          KORAN CHAMBERS:  Good.
9          OFFICER JOSEPH KEEGAN:  Do you have your
10    driver's license and registration on you?  Where's it at?
11          KORAN CHAMBERS:  In the back.
12          OFFICER JOSEPH KEEGAN:  All right.  That's all
13    right.  You can bring it out.  The reason I stopped you
14    is for the window tints.
15          KORAN CHAMBERS:  For the window tints?
16          OFFICER JOSEPH KEEGAN:  Yeah.  You ever get
17    pulled over for that?
18          KORAN CHAMBERS:  (Inaudible).
19          OFFICER JOSEPH KEEGAN:  Say it again?
20          KORAN CHAMBERS:  I said, I got in the car.  It
21    had it like this.  I don't know how to get them off.
22          OFFICER JOSEPH KEEGAN:  All right, I got you.
23    What are you up to tonight?
24          KORAN CHAMBERS:  I'm (inaudible).
25          OFFICER JOSEPH KEEGAN:  Okay, where are you

1      coming from?

2              KORAN CHAMBERS:  (Inaudible).

3              OFFICER JOSEPH KEEGAN:  (Inaudible) house?

4              KORAN CHAMBERS:  Yeah.

5              OFFICER JOSEPH KEEGAN:  All right.  Do me a

6      favor, just hang out real quick, all right?  Yo, where's

7      the front plate at?

8              POLICE OFFICER 1:  (Inaudible)?

9              OFFICER JOSEPH KEEGAN:  Yeah.  Oh, you got it?

10             POLICE OFFICER 1:  It fell off, or -- okay, all

11     right, you got to get out of the car.

12             POLICE OFFICER 2:  Yeah, you got to get out of

13     the car.  (Inaudible).

14             POLICE OFFICER 3:  All right.  (Inaudible).

15             POLICE OFFICER 2:  What?

16             POLICE OFFICER 3:  (Inaudible).

17             POLICE OFFICER 2:  I got (inaudible).

18             OFFICER JOSEPH KEEGAN:  Yeah, you got to wait,

19     my man.

20             POLICE OFFICER 2:  I will do that.  (Inaudible)

21     good for your hair.  No, get rid of baldness.  Don't do

22     that.  My friend did that (inaudible) growing out so bad.

23             POLICE OFFICER 3:  (Inaudible).

24             POLICE OFFICER 2:  Where are you going from?

25     Where are you coming from?  (Inaudible)?  Okay,

PROCEEDINGS

1    (inaudible).  Yeah, no, we (inaudible).  We do

2    (inaudible) other guy, (inaudible) now, but (inaudible),

3    all right?  (Inaudible).  You got to do what you got to

4    do, (inaudible).

5            You got my buddy (inaudible).  He's rolling in

6    the money.  It's just automatic.  You're on the road

7    (inaudible), everything, it's good money.  It's dirty

8    work but it's clean money.  (Inaudible).

9            OFFICER JOSEPH KEEGAN:  Koran?  When was the

10   last time you got in trouble on this car?

11           KORAN CHAMBERS:  On this car?

12           OFFICER JOSEPH KEEGAN:  Yeah.

13           KORAN CHAMBERS:  Meaning what?

14           OFFICER JOSEPH KEEGAN:  Just in general.

15           KORAN CHAMBERS:  I mean --

16           OFFICER JOSEPH KEEGAN:  You got arrested while

17   driving this car.

18           KORAN CHAMBERS:  Arrested?

19           OFFICER JOSEPH KEEGAN:  Yeah.

20           KORAN CHAMBERS:  No.  Never arrested.

21           OFFICER JOSEPH KEEGAN:  Anyone else arrested

22   while driving this car?

23           KORAN CHAMBERS:  No.

24           OFFICER JOSEPH KEEGAN:  These plates?

25           KORAN CHAMBERS:  These plates?  No, I don't

People of the State of New York / Chambers 10/19/2022        5
PROCEEDINGS

1    know.  This is my car.

2                    OFFICER JOSEPH KEEGAN:  When did you get the

3    car?

4                    KORAN CHAMBERS:  This car, probably about a

5    year now ago.

6                    OFFICER JOSEPH KEEGAN:  Okay.  Yeah, I just see

7    some arrests associated with the car.  That's why I'm

8    asking you.

9                    KORAN CHAMBERS:  What kind of arrests

10   (inaudible).

11                   OFFICER JOSEPH KEEGAN:  I'm asking you, because

12   they come off on here.  That's why I was just asking you.

13                   POLICE OFFICER 2:  When'd you buy the car?

14                   KORAN CHAMBERS:  I bought it a year ago.

15                   OFFICER JOSEPH KEEGAN:  All right.  Do you have

16   the registration for it?

17                   KORAN CHAMBERS:  Registration the window.  I

18   got the -- insurance ought to be (inaudible).

19                   OFFICER JOSEPH KEEGAN:  All right.  Do you want

20   to check for the insurance (inaudible)?  It's not in the

21   glove box?

22                   KORAN CHAMBERS:  No, no, no.

23                   OFFICER JOSEPH KEEGAN:  When'd you get a

24   ticket?

25                   KORAN CHAMBERS:  (Inaudible).

1            OFFICER JOSEPH KEEGAN:  Who wrote you that?

2            KORAN CHAMBERS:  (Inaudible).

3            OFFICER JOSEPH KEEGAN:  And what?

4            KORAN CHAMBERS:  (Inaudible).

5            OFFICER JOSEPH KEEGAN:  Okay, Koran, while

6    you're looking for that, why don't you just step out?

7            KORAN CHAMBERS:  (Inaudible), I got the

8    insurance right here, bro.

9            OFFICER JOSEPH KEEGAN:  That's fine.  You can

10   just step out.  I just want to talk to you real quick.

11           KORAN CHAMBERS:  (Inaudible)?

12           OFFICER JOSEPH KEEGAN:  Boss, just do me a

13   favor, just step out of the car.  I want to talk to you,

14   all right?  It's just -- for my safety, I want to

15   continue the traffic stop talking out here.

16           KORAN CHAMBERS:  Why?

17           POLICE OFFICER:  Yeah, it'll take two seconds,

18   come on.

19           KORAN CHAMBERS:  Yeah, but why, though?

20           OFFICER JOSEPH KEEGAN:  Boss man, on any car

21   stop, we're allowed you to step out of the vehicle just

22   for our safety, okay?  And if you don't have the

23   registration and all this stuff for the car and I have to

24   continue to -- continue the traffic stop, I'd rather --

25           KORAN CHAMBERS:  -- in the window, Officer.

People of the State of New York / Chambers 10/19/2022      7
PROCEEDINGS

1            OFFICER JOSEPH KEEGAN:  I understand.

2            KORAN CHAMBERS:  And my insurance card is right

3     here, so what am I stepping out for?

4            OFFICER JOSEPH KEEGAN:  You don't have the

5     registration paperwork on you.  I understand the

6     registration's in the car, and I asked you before, when I

7     came up here.  I said, you know, you've got the tints on

8     the car.  You mentioned nothing about the tickets.  I

9     just want to talk to you outside the car, that's all.  It

10    shouldn't be a problem, bro.  You're going to be out here

11    -- you're going to be on your way in two seconds.  Is

12    there any issues going on?

13           KORAN CHAMBERS:  I'm -- no, there's not -- no

14    issues.  I'm just saying, I've been sitting right here

15    for mad long, bro.

16           OFFICER JOSEPH KEEGAN:  All right.

17           KORAN CHAMBERS:  Come on, man.

18           OFFICER JOSEPH KEEGAN:  We'll have you out of

19    here in two seconds, all right?  You got nothing on you?

20           KORAN CHAMBERS:  No.  What do you --

21           OFFICER JOSEPH KEEGAN:  Nothing man.  Just

22    talking to you, all right?  That's all.

23           POLICE OFFICER 2:  (Inaudible).

24           POLICE OFFICER 3:  Put yourself against the

25    bumper.  That's all we want.

People of the State of New York / Chambers 10/19/2022          8
PROCEEDINGS

1          OFFICER JOSEPH KEEGAN:  Okay, just keep your

2     hands out of your pocket.  (Inaudible) search you quick

3     or --

4          KORAN CHAMBERS:  Sir, I'm --

5          OFFICER JOSEPH KEEGAN:  Just keep your hands

6     out of your pockets while we're talking, okay?

7          KORAN CHAMBERS:  (Inaudible) search the car?

8          OFFICER JOSEPH KEEGAN:  No, no, I'm not

9     searching the car.  I'm just running the registration.

10     It's just safer for me to have you stand back here with

11     my partner while I'm doing that.

12          POLICE OFFICER 2:  He's going to make sure the

13     VIN number on the door matches the dashboard.

14          OFFICER JOSEPH KEEGAN:  That's it.

15          KORAN CHAMBERS:  All right.

16          POLICE OFFICER:  (Inaudible).

17          OFFICER JOSEPH KEEGAN:  It's no big deal.

18          POLICE OFFICER 2:  (Inaudible) -- I'm not

19     saying you, but we've had issues where w4e've done this

20     (inaudible).  All right?  You'll be out of here in two

21     seconds.  (Inaudible).  You got your (inaudible) yet or

22     not yet?

23          There's not (inaudible).  He's not looking in

24     your car.  Do you mind if he checks the car, make sure

25     there's no weapons or anything like that?  What was that?

People of the State of New York / Chambers 10/19/2022          9
PROCEEDINGS

1            OFFICER JOSEPH KEEGAN:  What'd he say,

2       (inaudible)?  Your answer, brother?

3            KORAN CHAMBERS:  What?

4            OFFICER JOSEPH KEEGAN:  Listen, the VIN's not

5       coming back right now when I searched it, all right?

6            KORAN CHAMBERS:  What do you mean, it's not

7       coming back?  What do you want me to do?  I don't --

8            POLICE OFFICER 2:  Is this plate your -- is

9       this plate legit?

10            KORAN CHAMBERS:  Yes, the car is registered

11       (inaudible).

12            OFFICER JOSEPH KEEGAN:  All right, let me

13       (inaudible) real quick on him.  Yeah, you want to just

14       keep working on that?

15            POLICE OFFICER 2:  Yeah.

16            OFFICER JOSEPH KEEGAN:  Let me just talk to you

17       real quick, all right?  We're being completely cordial

18       with you, right?

19            KORAN CHAMBERS:  Right.

20            OFFICER JOSEPH KEEGAN:  All right, I got no

21       reason to give you a hard time or anything --

22            POLICE OFFICER 2:  This window doesn't open,

23       right?  This window --

24            OFFICER JOSEPH KEEGAN:  Yeah, you said that

25       window doesn't open?

1       KORAN CHAMBERS:  No.

2       OFFICER JOSEPH KEEGAN:  All right.  My man.

3   Little things, indicators to me when I'm on a traffic

4   stop, you know, it can either raise my suspicion, lower

5   my suspicion, okay?  I'm being totally cordial with you,

6   calm right now.

7           Every little questions I ask you, little things

8   like in the beginning about why I pulled you over and

9   stuff like that, and you got tickets.  The only thing you

10  mention that to me right off the bat, that you got two

11  tickets for -- okay, Officer, I already got pulled over

12  today for no front plate.

13      KORAN CHAMBERS:  No, I didn't get pulled over.

14  That was when the car was parked.  Okay?

15      OFFICER JOSEPH KEEGAN:  That was parking

16  tickets?  Okay.  Either way, all right?  And then, I'm

17  trying to talk to you really nice.  I'm not, you know,

18  not being mean or anything like that.  I asked you to

19  step out of the car and you're kind of being a little

20  apprehensive with me, okay?

21          That's what's making us a little apprehensive,

22  a little -- more -- raises my suspicion a little, so I

23  asked you to step out of the car.  Now I'm talking to you

24  back here, and you seem very uneasy.  You're dripping

25  sweat right now, profusely, and it's cold out.

People of the State of New York / Chambers 10/19/2022    11
PROCEEDINGS

1          KORAN CHAMBERS:  All right, (inaudible) you got

2    the lights in my eyes (inaudible).

3          OFFICER JOSEPH KEEGAN:  I hear you, man, but

4    what's going on right now?  what's really going on?

5          KORAN CHAMBERS:  Nothing going on, may.

6          OFFICER JOSEPH KEEGAN:  All right.  Well,

7    normal -- normally people won't be sweating when it's 40

8    degrees out, 40-something degrees out.  It's a little

9    chilly tonight.  And the VIN's not coming back right

10   away.

11         KORAN CHAMBERS:  Run the plate.  Does the plate

12   come to my name --

13         OFFICER JOSEPH KEEGAN:  Yeah, yeah, it does.

14   It does.  That's why I was trying to make sure

15   everything's legit, okay?

16         KORAN CHAMBERS:  All right.

17         OFFICER JOSEPH KEEGAN:  I'm going to ask you

18   one more time, do you mind if we search your car?  I can

19   -- like I said before, I could only search your car if

20   you give me consent.  That's why I'm asking you.

21         KORAN CHAMBERS:  No, (inaudible).

22         OFFICER JOSEPH KEEGAN:  Okay.

23         KORAN CHAMBERS:  (Inaudible).

24         OFFICER JOSEPH KEEGAN:  What's that?

25         KORAN CHAMBERS:  I (inaudible).

People of the State of New York / Chambers 10/19/2022    12
PROCEEDINGS

1          OFFICER JOSEPH KEEGAN:  Yes, it's going to be

2    two seconds and then I'll get you out of here, okay?

3          KORAN CHAMBERS:  Okay.

4          OFFICER JOSEPH KEEGAN:  Do you have the

5    license?

6          POLICE OFFICER 2:  Yeah, (inaudible).

7          POLICE OFFICER:  Yeah, (inaudible).

8          POLICE OFFICER 2:  It's good, it's good.  I got

9    it.  No, it came back.  The DMV's all jacked up, so

10    sometimes it (inaudible).  Sometimes, we've got to do it

11    two, three times.

12          OFFICER JOSEPH KEEGAN:  I'm trying to get the

13    client ID, but it's not coming up.  (Inaudible)?

14          POLICE OFFICER 2:  (Inaudible).

15          OFFICER JOSEPH KEEGAN:  Yeah, why don't you try

16    one more time?  I'm showing your license right now,

17    that's all.  All right?

18          POLICE OFFICER 2:  Do you have a license plate?

19          OFFICER JOSEPH KEEGAN:  That's all.  Mr.

20    Chambers, what's going on?

21          POLICE OFFICER 2:  If there's something you

22    need to tell us, now's the time.

23          OFFICER JOSEPH KEEGAN:  Yeah.  All right, I'm

24    trying to run your license right now, it's the last thing

25    I'm going to do, but I can't be sitting here and not

People of the State of New York / Chambers 10/19/2022    13
PROCEEDINGS

1    asking you questions while you're sweating profusely,

2    bro.  Keep it real with us, all right?

3              POLICE OFFICER 2:  You got something you're not

4    supposed to have?

5              KORAN CHAMBERS:  (Inaudible) shit, bro.

6              OFFICER JOSEPH KEEGAN:  All right, let me ask

7    you.  What's going on with your jeans down there, boss

8    man?  (Inaudible).  All right.

9              POLICE OFFICER:  (Inaudible).

10             OFFICER JOSEPH KEEGAN:  All right, all right.

11   All right, chill out, chill out.  We got it.  Don't

12   fucking reach.  Don't even move.  All right?

13             KORAN CHAMBERS:  (Inaudible) lights.

14             OFFICER JOSEPH KEEGAN:  You got him cuffed?

15   Get him cuffed first.

16             POLICE OFFICER:  I got him cuffed.

17             OFFICER JOSEPH KEEGAN:  Just get the hands

18   cuffed.  I got it.

19             KORAN CHAMBERS:  (Inaudible).

20             POLICE OFFICER:  (Inaudible).

21             OFFICER JOSEPH KEEGAN:  All right, yeah, we're

22   going to (inaudible).  Just don't move, all right?

23             KORAN CHAMBERS:  (Inaudible).

24             POLICE OFFICER:  (Inaudible)?

25             OFFICER JOSEPH KEEGAN:  Yeah, yeah, yeah.

People of the State of New York / Chambers 10/19/2022    14
PROCEEDINGS

1           POLICE OFFICER:  (Inaudible).

2           OFFICER JOSEPH KEEGAN:  (Inaudible).

3           POLICE OFFICER:  (Inaudible).

4           POLICE OFFICER:  That's why I asked you, man.

5    Just be honest.  Just be cool with us.  We're being

6    straight with you, haven't we?

7           KORAN CHAMBERS:  (Inaudible).

8           POLICE OFFICER:  All right, it's all good.

9    Relax.

10           OFFICER JOSEPH KEEGAN:  I got to unbutton these

11   pants.  I don't want to let go.

12           KORAN CHAMBERS:  (Inaudible).

13           OFFICER JOSEPH KEEGAN:  All right, bro.  It's

14   all --

15           KORAN CHAMBERS:  I'm good, bro.  I'm good, bro.

16           OFFICER JOSEPH KEEGAN:  Be careful.

17           POLICE OFFICER:  This is (inaudible).

18           OFFICER JOSEPH KEEGAN:  Yeah, give me a light,

19   give me a light, Joe, give me a light, (inaudible).

20           KORAN CHAMBERS:  (Inaudible).

21           POLICE OFFICER:  (Inaudible).

22           OFFICER JOSEPH KEEGAN:  Just (inaudible).

23           POLICE OFFICER 2:  Yeah, we're good.

24           KORAN CHAMBERS:  (Inaudible).

25           OFFICER JOSEPH KEEGAN:  Just (inaudible) him

People of the State of New York / Chambers 10/19/2022    15
PROCEEDINGS

1    again, make sure there's nothing else.

2              KORAN CHAMBERS:  (Inaudible) good, bro.

3    (Inaudible) good.  (Inaudible).

4              POLICE OFFICER 2:  No, you're good, you're

5    good.

6              POLICE OFFICER 3:  Yeah, yeah.

7              KORAN CHAMBERS:  (Inaudible), bro.  I was doing

8    good, bro.

9              POLICE OFFICER 3:  It's not a big deal.

10             KORAN CHAMBERS:  I was doing mad good, bro.

11    (Inaudible).  I'm good, bro.  I was doing good, bro.

12             OFFICER JOSEPH KEEGAN:  He's cuffed good?

13             POLICE OFFICER 3:  Yeah.

14             KORAN CHAMBERS:  (Inaudible), bro.  I am good,

15    bro.

16             POLICE OFFICER 2:  It's not a big deal.

17             KORAN CHAMBERS:  It is, bro, it is, bro.

18    (Inaudible) bro, I ain't been in trouble in mad long,

19    bro.  I just --

20             POLICE OFFICER 3:  Hold this.

21             KORAN CHAMBERS:  Did all my fucking -- did

22    time, bro.  Now I got to do this time again, bro.  Time

23    again, bro.  Again, bro.  This is dumb shit, bro.

24             POLICE OFFICER 2:  You got anything else,

25    (inaudible) there?

People of the State of New York / Chambers 10/19/2022    16
PROCEEDINGS

1              KORAN CHAMBERS:  No, sir.  Bro, that's it, bro.

2    You all got it.

3              POLICE OFFICER 2:  That's it?

4              KORAN CHAMBERS:  That's it, brother.

5              OFFICER JOSEPH KEEGAN:  That's it?  You don't

6    have anything else on you?

7              KORAN CHAMBERS:  They got it, bro.  They got

8    it.  That's it.

9              POLICE OFFICER 3:  They're coming.  They're

10   coming (inaudible).

11             OFFICER JOSEPH KEEGAN:  Just wait for them to

12   get here and then we'll (inaudible).

13             POLICE OFFICER 2:  Couple (inaudible) division?

14             POLICE OFFICER 3:  Yeah, I got it.  I got it.

15   I got it.

16             POLICE OFFICER:  Just going to go over to

17   public safety.

18             OFFICER JOSEPH KEEGAN:  I mean, you don't even

19   got to -- oh, yeah.

20             POLICE OFFICER 2:  (Inaudible).

21             OFFICER JOSEPH KEEGAN:  All right.

22             POLICE OFFICER 2:  Just wherever you were going

23   to put that, they can work on it.

24             OFFICER JOSEPH KEEGAN:  Yeah.

25             KORAN CHAMBERS:  (Inaudible), bro.  Fuck.

1    Fucked my life up, just now, bro.

2                 POLICE OFFICER 2:  (Inaudible).

3                 KORAN CHAMBERS:  Fucked my life up.  It's just

4    not -- it's not all good, bro.  I just fucked my life up,

5    bro.  just fucked my life up, bro.  (Inaudible).  Oh man.

6    What am I looking at now, fellas?  What am I looking at

7    now?

8                 POLICE OFFICER 2:  What's going to happen now?

9    We're taking you back to the precinct.

10                KORAN CHAMBERS:  How much time we looking at,

11   thought?

12                POLICE OFFICER 2:  Honestly?  I can't -- don't

13   --

14                OFFICER JOSEPH KEEGAN:  Yeah, we're not --

15                KORAN CHAMBERS:  I got --

16                OFFICER JOSEPH KEEGAN:  Don't even sweat that

17   right now.

18                POLICE OFFICER 2:  Don't even worry about that.

19                KORAN CHAMBERS:  I need to.  I got to start

20   thinking about my time.  I can't really --

21                POLICE OFFICER 2:  Yeah, I told them we need

22   transport.  So, they'll come.  They're going to bring it

23   back to the precinct and then we'll bring the car back,

24   too.

25                KORAN CHAMBERS:  Can't even fucking -- can't

People of the State of New York / Chambers 10/19/2022    18
PROCEEDINGS

```
 1        even play (inaudible).  I got to start thinking about
 2        time.
 3                  POLICE OFFICER:  Listen.  Turn around.
 4                  KORAN CHAMBERS:  I fucked up, bro.  I should've
 5        never had -- never been like this, bro.  Never been like
 6        this, bro.  I fucked up, bro.
 7                  OFFICER JOSEPH KEEGAN:  I appreciate you being
 8        cooperative, though,  We appreciate that.
 9                  POLICE OFFICER 2:  From this point forward,
10        listen, we treat you with respect, you treat us with
11        respect, and we're going to get -- we're going to make
12        this nice and easy, all right?  All right, we'll get you
13        down to court, we'll get it all done.  You'll be out
14        tomorrow.  All right?
15                  POLICE OFFICER:  Let's give him another toss
16        real quick, all right?
17                  POLICE OFFICER 3:  Just give another toss.
18                  OFFICER JOSEPH KEEGAN:  Can we get someone to
19        bring the car back?
20                  POLICE OFFICER:  Yes.  They're coming.
21                  POLICE OFFICER 2:  Turn around?  Just turn
22        right.
23                  POLICE OFFICER:  It's all good.  It's all good.
24                  POLICE OFFICER 2:  That have you been collared
25        for?  What's your last arrest for?  For this?
```

People of the State of New York / Chambers 10/19/2022    19
PROCEEDINGS

1           KORAN CHAMBERS:  (Inaudible).

2           POLICE OFFICER 2:  Only this?

3           KORAN CHAMBERS:  No.

4           POLICE OFFICER 2:  First one?  You'll be all

5   right.  You'll be all right.  Listen, shit happens.  All

6   right?  You'll be all right.

7           OFFICER JOSEPH KEEGAN:  (Inaudible)?

8           POLICE OFFICER 2:  He said two minutes.

9           OFFICER JOSEPH KEEGAN:  All right.  Call

10  (inaudible).

11          POLICE OFFICER 2:  Yeah, well --

12          OFFICER JOSEPH KEEGAN:  (Inaudible) 13, right?

13          POLICE OFFICER 3:  Yeah?

14          POLICE OFFICER:  Yeah.

15          POLICE OFFICER:  Yeah.

16          POLICE OFFICER 2:  We want 113.

17          OFFICER JOSEPH KEEGAN:  (Inaudible) start

18  sweating.

19          KORAN CHAMBERS:  I just knew.  I just knew.  I

20  just knew.  I knew.  Soon as I seen you, I just knew.

21  (Inaudible).

22          OFFICER JOSEPH KEEGAN:  (Inaudible) that.

23          KORAN CHAMBERS:  I'm trying to move, bro.  I

24  swear to God, bro.  I've been trying to move, (inaudible)

25  and move, bro.  I want to be able to -- because the way I

People of the State of New York / Chambers 10/19/2022     20
PROCEEDINGS

```
 1      live now --
 2                  POLICE OFFICER:  Where do you live?
 3                  KORAN CHAMBERS:  (Inaudible) I'm doing better
 4      than these niggas out here and these fucking petty ass
 5      fuckers out here, you feel me?  I want to be -- I want to
 6      move.
 7                  POLICE OFFICER 2:  Make this it's your last --
 8      make this your last --
 9                  KORAN CHAMBERS:  I want to move, bro.  I want
10      to be moved.  I want to have my own legit shit.  I don't
11      want to ever have to (inaudible) --
12                  POLICE OFFICER:  So, do this.  Make this your
13      last day.
14                  KORAN CHAMBERS:  -- I can't even -- I'm never -
15      - I'm never going to be able to do this.  I'm never going
16      to be able to get legit shit, man.
17                  POLICE OFFICER 2:  It's all good.  (Inaudible)
18      stuff in your pocket?  These guys are going to bring you
19      back to the precinct for us.  We'll get you (inaudible),
20      all right?
21                  POLICE OFFICER:  We'll meet you there with all
22      your stuff.  Just take everything out.
23                  POLICE OFFICER 2:  Yeah.
24                  OFFICER JOSEPH KEEGAN:  (Inaudible).  Got to
25      bring him back.  When I called, he was sweating.
```

People of the State of New York / Chambers 10/19/2022    21
PROCEEDINGS

1    (Inaudible).

2              POLICE OFFICER:  (Inaudible).

3              POLICE OFFICER 3:  What's up?

4              POLICE OFFICER:  (Inaudible).

5              POLICE OFFICER 3:  Yeah, I'll (inaudible) the

6    car.  We got keys for it?  Are they in there?

7              POLICE OFFICER:  Are they in your pocket?

8              POLICE OFFICER 2:  Keys should be in it.

9              POLICE OFFICER:  Yeah.

10             POLICE OFFICER 2:  And should still be running,

11   too.

12             POLICE OFFICER:  Yeah, yeah, yeah.

13             POLICE OFFICER 2:  Put him in your car or?

14             KORAN CHAMBERS:  (Inaudible).

15             POLICE OFFICER 2:  Yeah, put him in  our car.

16   All right.

17             POLICE OFFICER:  (Inaudible).

18             OFFICER JOSEPH KEEGAN:  Yeah, he's (inaudible).

19             POLICE OFFICER:  I got it.

20             POLICE OFFICER:  What's this, the 105?

21             OFFICER JOSEPH KEEGAN:  This is the 113.

22             POLICE OFFICER:  Mikey (inaudible).

23             POLICE OFFICER:  Yeah, you want to, just, on

24   the way there, (inaudible)?

25             OFFICER JOSEPH KEEGAN:  Already on is, big guy.

1                    POLICE OFFICER:  I don't know why I doubt you,
2       bro.
3                    OFFICER JOSEPH KEEGAN:  Hey, what's going on,
4       man?  This is Officer Keegan from Queens Auto Larceny.
5       Not much.  I'm on 190 and Linden.  We got a (inaudible),
6       but we're heading back to 113 on this person.  Yeah.
7       (Inaudible).  No, (inaudible).  yeah, about -- yeah,
8       probably like, 15 minutes we'll be there.  Yeah.  Yeah,
9       we're with Auto Larceny.
10                   POLICE OFFICER:  I'll just follow you.
11                   POLICE OFFICER:  All right, you put it over,
12      right?
13                   OFFICER JOSEPH KEEGAN:  Yeah, hello?  Yeah.
14      2991.  Just want to write that down?
15                   POLICE OFFICER:  (Inaudible).
16                   POLICE OFFICER:  29 -- they'll give it to you
17      when you get there.  2991.
18                   POLICE OFFICER:  All right, I got it.
19                   OFFICER JOSEPH KEEGAN:  All right, thanks.
20                   POLICE OFFICER:  (Inaudible).
21                   OFFICER JOSEPH KEEGAN:  What's up?
22                   POLICE OFFICER:  (Inaudible).
23                   OFFICER JOSEPH KEEGAN:  Yeah, I think so.
24                   POLICE OFFICER:  They'll give it to you when
25      you get there.  We don't really need it now.

People of the State of New York / Chambers 10/19/2022    23
PROCEEDINGS

1          POLICE OFFICER:  (Inaudible).

2          OFFICER JOSEPH KEEGAN:  That guy was so -- I

3     couldn't hear him (inaudible).  I think Sergeant Bower.

4     I think so.

5          POLICE OFFICER:  Was it in his pants?

6     (Inaudible).

7          OFFICER JOSEPH KEEGAN:  Yeah.  So, I'm -- yeah,

8     I'm staying live.  You guys want to stay live until you

9     get back or --

10         POLICE OFFICER:  Yeah, we just keep in on until

11    we get to the precinct.

12         OFFICER JOSEPH KEEGAN:  Yeah.

13         POLICE OFFICER:  Just so it shows that we're

14    transporting him.

15         OFFICER JOSEPH KEEGAN:  Yeah, so (inaudible).

16         POLICE OFFICER:  You're not planting it on him.

17         OFFICER JOSEPH KEEGAN:  Yeah.

18         POLICE OFFICER:  This fucking dude.

19    (Inaudible).  We'll see you soon.  Who's taking him?

20         OFFICER JOSEPH KEEGAN:  Me.

21         POLICE OFFICER:  Yeah, just go in, (inaudible).

22         OFFICER JOSEPH KEEGAN:  Okay.

23         POLICE OFFICER:  That's all you really need to

24    do right now.

25         OFFICER JOSEPH KEEGAN:  All right, cool.

People of the State of New York / Chambers 10/19/2022    24
PROCEEDINGS

1           POLICE OFFICER:  (Inaudible).  Joe (inaudible)
2      over here, too.  I mean -- yeah, Joe.
3           OFFICER JOSEPH KEEGAN:  Sorry (inaudible).  Do
4      you know if Murray (inaudible) or --
5           POLICE OFFICER:  What's that?
6           OFFICER JOSEPH KEEGAN:  Did you hear if Murray
7      got another time or --
8           POLICE OFFICER:  I don't know if anybody put it
9      over, but (inaudible).
10          POLICE OFFICER:  I didn't hear.
11          OFFICER JOSEPH KEEGAN:  Yeah, I think
12     (inaudible).
13          POLICE OFFICER:  That your work phone?
14          POLICE OFFICER:  (Inaudible).
15          OFFICER JOSEPH KEEGAN:  158280.  (Inaudible).
16     Thank you.
17          POLICE OFFICER:  I'm going to send you the CAD.
18     Just got to print it out.
19          OFFICER JOSEPH KEEGAN: All right, thanks.
20          POLICE OFFICER:  What's your email?
21          OFFICER JOSEPH KEEGAN:  It's Joseph.  J-O-S-E-
22     P-H.  Dot Keegan.  K-E-E-G-A-N.  At NYPD.org.
23          POLICE OFFICER:  You're not (inaudible), too?
24          OFFICER JOSEPH KEEGAN:  No.
25          POLICE OFFICER:  Throw (inaudible).  Keep it on

People of the State of New York / Chambers 10/19/2022    25
PROCEEDINGS

```
 1        and then throw them (inaudible) in the car.
 2                OFFICER JOSEPH KEEGAN:  (Inaudible).
 3                POLICE OFFICER:  Yeah.
 4                OFFICER JOSEPH KEEGAN:  Until ACP gets here?
 5                POLICE OFFICER:  Yeah, we'll just put in a gun
 6        locker and lock it with the cuffs until he gets here.
 7                OFFICER JOSEPH KEEGAN:  .380?
 8                POLICE OFFICER:  Joe, can you just grab --
 9                OFFICER JOSEPH KEEGAN:  What do you need?
10                POLICE OFFICER:  (Inaudible).
11                OFFICER JOSEPH KEEGAN:  Yeah, there's on in
12        there already.  Nothing really up here.  What this is,
13        key or something.
14                POLICE OFFICER:  There's nothing in there.
15                OFFICER JOSEPH KEEGAN:  Nothing in there?
16                POLICE OFFICER:  Just lock it with your cuff.
17                OFFICER JOSEPH KEEGAN:  (Inaudible).
18                POLICE OFFICER:  Yeah.
19                OFFICER JOSEPH KEEGAN:  Stand up.  Nothing
20        else?
21                KORAN CHAMBERS:  No.  That's it.  No.
22                OFFICER JOSEPH KEEGAN:  What's that?
23                KORAN CHAMBERS:  (Inaudible).
24                POLICE OFFICER:  What's your phone number, man?
25                KORAN CHAMBERS:  718.
```

People of the State of New York / Chambers 10/19/2022      26
PROCEEDINGS

1              POLICE OFFICER:  Yeah.

2              KORAN CHAMBERS:  (Inaudible).

3              POLICE OFFICER:  17824.  960.

4              OFFICER JOSEPH KEEGAN:  I'm going to take this

5     belt off.  You know how much money you have on you?

6              KORAN CHAMBERS:  No.

7              OFFICER JOSEPH KEEGAN:  (Inaudible)?

8              KORAN CHAMBERS:  (Inaudible).

9              OFFICER JOSEPH KEEGAN:  I'm just saying in

10    general, do you know (inaudible) or not?

11             KORAN CHAMBERS:  (Inaudible).

12             OFFICER JOSEPH KEEGAN:  Okay, I'm going to

13    (inaudible).  Do you have a lot of money on you?  Just in

14    general, do you know off the top of your head or not?

15             KORAN CHAMBERS:  (Inaudible).

16             OFFICER JOSEPH KEEGAN:  I'm going to count --

17    just have to count it and account for it.  You have any

18    other money on you?

19             KORAN CHAMBERS:  (Inaudible).

20             OFFICER JOSEPH KEEGAN:  Just one second.  Do

21    you need an ambulance?  No medical attention?  You good?

22    Spread your legs.  This way.  Same way.  You face me.

23    Just step over a little bit.

24             POLICE OFFICER:  555244.

25             POLICE OFFICER:  (Inaudible) the chain off.

Case 1:25-cv-02860-NCM-JRC     Document 1     Filed 05/22/25     Page 37 of 73 PageID #:
37
People of the State of New York / Chambers 10/19/2022     27
PROCEEDINGS

1          OFFICER JOSEPH KEEGAN:  Yeah, I'll do it.  Just

2     hold onto the rest of this for me, please.  This come off

3     straight over your head?

4          KORAN CHAMBERS:  (Inaudible).

5          POLICE OFFICER 2:  It's got a latch in front.

6          OFFICER JOSEPH KEEGAN:  Oh, it does?

7          KORAN CHAMBERS:  It's really religious.  Not

8     supposed to (inaudible).

9          OFFICER JOSEPH KEEGAN:  (Inaudible).

10    Unfortunately, that's something you could use.  It's

11    going in the jewelry envelope, all right?  Okay.  Now, he

12    says he's got more than money in his pocket.

13          POLICE OFFICER:  Yeah, (inaudible).

14          POLICE OFFICER:  Okay.

15          POLICE OFFICER 2:  And this was all in the car

16    (inaudible).

17          OFFICER JOSEPH KEEGAN:  All the money that you

18    took off?  There any money in your wallet?  Money in your

19    phone or anything?  Have you step up here real quick, all

20    right?  Right there.

21          POLICE OFFICER:  (Inaudible).

22          OFFICER JOSEPH KEEGAN:  Just so you're on this

23    side.  I'm going to count it right now.  Denominations

24    out first.  20, 5, 10, 30, 31, 32, 33, 34, 35, 36, 37,

25    38.

People of the State of New York / Chambers 10/19/2022    28
PROCEEDINGS

1                    POLICE OFFICER:  $38.  All right.

2                    OFFICER JOSEPH KEEGAN:  You have that?

3                    KORAN CHAMBERS:  You're giving it back?

4                    OFFICER JOSEPH KEEGAN:  Yeah, we're going to

5          give it back to you.  What pocket you want it in?

6                    POLICE OFFICER:  This is a different address,

7          just so you know.

8                    OFFICER JOSEPH KEEGAN:  Okay.  Thank you.

9                    POLICE OFFICER 2:  You got the keys?

10                   OFFICER JOSEPH KEEGAN:  (Inaudible).

11                   POLICE OFFICER:  Want me to hold it?

12                   OFFICER JOSEPH KEEGAN:  Yeah, if you don't

13         mind.

14                   OFFICER JOSEPH KEEGAN:  (Inaudible).

15                   POLICE OFFICER:  That's an extra bag.

16                   OFFICER JOSEPH KEEGAN:  You got keys?  Yeah.

17                   KORAN CHAMBERS:  (Inaudible) there?

18                   OFFICER JOSEPH KEEGAN:  Yeah, I can get you

19         one.  Why don't you grab a (inaudible) real quick?

20                   POLICE OFFICER:  Here it is.

21                   OFFICER JOSEPH KEEGAN:  we can grab it after.

22         (Inaudible).  Turn a little backwards.  Put your arm up.

23                   POLICE OFFICER 2:  (Inaudible) real quick.

24         (Inaudible) socks.  (Inaudible) just make sure you got

25         nothing in your socks.

People of the State of New York / Chambers 10/19/2022    29
PROCEEDINGS

1           OFFICER JOSEPH KEEGAN:  (Inaudible).

2           POLICE OFFICER:  All right.

3           OFFICER JOSEPH KEEGAN:  Inside out.  Let me see

4     the bottom of your foot quick.  All right.

5           POLICE OFFICER :  Put it back on.

6           KORAN CHAMBERS:  My foot's (inaudible).

7           POLICE OFFICER:  You'd be surprised where the

8     guys hide (inaudible).

9           KORAN CHAMBERS:  (Inaudible).

10          POLICE OFFICER:  We'll put you in here quick.

11    I'll grab you a mask.  All right?  You good?

12          OFFICER JOSEPH KEEGAN:  Yeah.

13          POLICE OFFICER:  (Inaudible).

14          OFFICER JOSEPH KEEGAN:  Yeah, it should be

15    right on the desk.  (Inaudible).

16          KORAN CHAMBERS:  (Inaudible).  This is

17    (inaudible).

18          OFFICER JOSEPH KEEGAN:  All right.  Just take

19    that hoodie off real quick.  I just want to check it one

20    more time -- off you.

21          POLICE OFFICER:  You want something to eat,

22    man?  Water?  Food?

23          KORAN CHAMBERS:  No, just --

24          POLICE OFFICER:  We'll get you (inaudible).

25          KORAN CHAMBERS:  Yeah, (inaudible) --

People of the State of New York / Chambers 10/19/2022    30
PROCEEDINGS

1              POLICE OFFICER:  Food, something?  Like I told

2      you on the street, you treat us good, we treat you good.

3      We'll (inaudible) soon, all right?

4              KORAN CHAMBERS:  I'll take a water.

5              POLICE OFFICER:  I'll get you water.

6      (Inaudible).  If you need something, shout.

7              KORAN CHAMBERS:  (Inaudible).

8              OFFICER JOSEPH KEEGAN:  Okay.  Just stand up

9      one more time for me to check you once more.  Face away

10     from me.  Spread your legs far as you can.  All right.

11             POLICE OFFICER:  Just hold on to the jacket --

12     you want to wear your jacket?

13             KORAN CHAMBERS:  Yeah.

14             POLICE OFFICER:  (Inaudible).

15             DETECTIVE LEVINE:  I'm Levine, this is Keegan.

16     All right?  I'm Levine.  This is Keegan.  If you need

17     something, shout.

18             KORAN CHAMBERS:  Levine?

19             DETECTIVE LEVINE:  I'm Levine, Detective

20     Levine.  This is Officer Keegan.

21             KORAN CHAMBERS:  And Keegan?

22             OFFICER JOSEPH KEEGAN:  Yeah, yeah.  We're your

23     AO, arresting officer, okay?

24             KORAN CHAMBERS:  (Inaudible).

25             POLICE OFFICER:  We'll get you water.

People of the State of New York / Chambers 10/19/2022    31
PROCEEDINGS

1                    (Proceedings Concluded)

2

3                    C E R T I F I C A T E

4

5    I, Sonya Ledanski Hyde, certify that the foregoing

6    transcript is a true and accurate record of the

7    proceedings.

8

9

10

11    _____

12

13    Veritext Legal Solutions

14    330 Old Country Road

15    Suite 300

16    Mineola, NY 11501

17

18    Date: April 24, 2025

19

20

21

22

23

24

# GRAND JURY TESTIMONY

G.L.3

 1              POLICE OFFICER JOSEPH KEEGAN,

 2   SHIELD NUMBER 17824, Patrol Borough of Queens South, was

 3   called as a witness, having first been duly sworn,

 4   testified as follows:

 5   BY MR. PILLER:

 6       Q.   Officer, if you could, I'd like you to take the

 7   microphone off and just keep your voice up so we can all

 8   hear.

 9            I'd like to direct your attention to October 19,

10   2022, between 8:45 p.m. and 9:04 p.m.  Are you familiar

11   with that date and time?

12       A.   Yes.

13       Q.   Were you working on that date?

14       A.   Yes.

15       Q.   And on that date, what was your assignment?  What

16   were you doing?

17       A.   I was just patrolling.

18       Q.   Were you patrolling on foot or were you in a

19   vehicle?

20       A.   We were in a vehicle.

21       Q.   Were you with a partner, by yourself?

22       A.   I was with a partner, two partners.

23       Q.   And while you were patrolling, was your attention

24   drawn to anything?

25       A.   Yes.

G.L.4

1    Q.   What was your attention drawn to?

2    A.   There was a red Jaguar with window tints and no

3    front license plate.

4    Q.   And would excessively tinted and omitted front

5    license plate, would those be Vehicle and Traffic Law

6    infractions?

7    A.   Yes.

8    Q.   After you observed those infractions, what, if

9    anything, did you do?

10   A.   Turned on my emergency lights and conducted our

11   car stop on that vehicle.

12   Q.   Did the car stop?

13   A.   Yes.

14   Q.   What was the location of that traffic stop?

15   A.   It was 190th Street and Linden Boulevard.

16   Q.   Is that in Queens County, New York?

17   A.   Yes.

18   Q.   Could you keep your voice up louder.

19   A.   Sorry.

20   Q.   After you stopped the vehicle at 190th Street and

21   Linden Boulevard, did you begin an investigation?  Did

22   you get out of your car; what happened?

23   A.   Yes, we conducted a car stop, and at that point I

24   asked the driver for his license and registration and

25   just begin what I normally do for any car stop.

1    Q.   Aside from the driver, was there anybody else
2    inside of the vehicle?
3    A.   No.
4    Q.   After you requested that documentation, did the
5    driver provide you with all that documentation?
6    A.   Yes, he just provided me with a driver's license,
7    I believe.
8    Q.   During the investigation, did the driver tell you
9    where he was going?
10   A.   Yeah, he said he was headed home.
11   Q.   Did he tell you where his home was or?
12   A.   No.
13   Q.   Did you ask?
14   A.   I don't recall.
15   Q.   Aside from the driver license, what other
16   documentation did you request?
17   A.   Insurance and registration.
18   Q.   What kind of information would the registration
19   tell you?
20   A.   Just the make, model, the vehicle and the license
21   plate and vehicle identification number which is the VIN
22   number.
23   Q.   Did you make a -- and to be clear, did the driver
24   provide you with that information?
25   A.   No, he attempted to, but he didn't provide me

1    with the registration.

2        Q.   Did you -- did you make any determination whether

3    this car belonged to him?

4        A.   I asked him that I believe.

5        Q.   And during your investigation, did you request

6    that the driver step outside of the vehicle?

7        A.   Yes.

8        Q.   What was your purpose for doing that?

9        A.   Just officer safety.  So we had a lot of cars

10    take off on us.  It was just safer to continue the

11    traffic stop at that point, talk to him outside.

12        Q.   After you asked the driver to step outside of the

13    car, did you continue to have a conversation with him?

14        A.   Yes.

15        Q.   Where did that conversation take place?

16        A.   He was standing at the rear of his vehicle with

17    his butt to the bumper, the car facing me.  His back was

18    to the vehicle.

19        Q.   And during that interaction, did you observe

20    anything on the driver of the vehicle?

21        A.   Yes, I observed a bulge that was consistent with

22    a size and shape of a firearm on his left leg.  It was

23    like protruding out from where his knee cap was.

24        Q.   Could you describe what the bulge looked like?

25        A.   To me it looked like a -- consistent with the

1   size and shape of a firearm.

2      Q.   What kind of firearm and shape are you talking

3   about?

4      A.   Okay, some like kind of like L like, the slide

5   where it meets.   Where like this almost look like

6   downward sticking out.   Where normally someone jeans you

7   wouldn't see an object protruding out from their knee

8   cap.   It was about knee level on the inside.

9      Q.   The record would reflect you are indicating a L

10  shape with your hand.   Can you stand up and maybe show

11  for the jury where on the leg you saw the bulge?

12     A.   He was standing like this and he had jeans on

13  just about tight as mine, maybe a little tighter.   It

14  was sticking out like that basically.

15          MR. PILLER:   The record will reflect that

16          the officer is indicating the leg above the left

17          knee cap.

18     Q.   Did you ask or did any of the other officers ask

19  whether the driver -- let me rephrase that.

20          Did you or any of the officers ask the driver

21  whether he had any weapons on him or anything that he

22  wasn't suppose to have on him?

23     A.   Yes.

24     Q.   Did the driver respond or did the driver answer

25  that question?

G.L.8

1    A.   I don't recall off the top of my head.  I think

2   he said, no.

3    Q.   After you observed the bulge, what did you do if

4   anything?

5    A.   I believe I asked him.  I said, what's going on

6   with your jeans down there and he made a face.

7   Basically, he looked down at the bulge I was asking him

8   about.  I pointed.  I said, what's going on with your

9   jeans down there, man.  He kind of did this and he --

10   then he looked up with kind of like a defeated look.  I

11   frisked the bulge and felt the firearm.

12    Q.   After you felt the firearm where the bulge was,

13   what happened next?

14    A.   I signalled to my partner I was working with that

15   day.  I said 92 which is a term for arrest.  When I said

16   92, when they hear that that means put the person in

17   handcuffs, he is under arrest at that point.

18    Q.   And was the driver arrested?

19    A.   Yes.

20    Q.   After he was arrested, was the object you felt

21   recovered?

22    A.   Yes.

23    Q.   What was -- what did you recover?

24    A.   It was a 380 firearm.  It was a Glock 42.

25    Q.   Was it loaded?

1    A.   Yes.

2    Q.   I'm approaching you with a picture that's marked

3    Grand Jury Exhibit Number 1.  I'm handing it to you.  Do

4    you recognize what I handed to you?

5    A.   Yes.

6    Q.   How do you recognize it?

7    A.   That's the gun from the night we are talking

8    about.

9    Q.   Is that the gun you recovered?

10   A.   Yes, that's the gun I recovered off the person.

11   Q.   Does that picture fairly and accurately reflect

12   the condition and the appearance of the guns that you

13   recovered as well as the ammunition?

14   A.   Yes.

15   Q.   Where was the ammunition located?

16   A.   It was -- there was, I believe, four rounds in

17   the magazine and one in the chamber of the firearm.

18          MR. PILLER:  We are moving and receiving

19          into evidence what is marked Grand Jury Exhibit

20          Number 1, and I'm going to publish it to the

21          Grand Jury.

22   Q.   Officer, did you learn the name of the person

23   that you arrested?

24   A.   Yes.

25   Q.   What was his name?

G.L.10

1    A.   Koran Chambers.

2    Q.   Is Koran Chambers the subject of this Grand Jury

3    investigation?

4    A.   Yes.

5    Q.   And were you -- at this time during this car

6    stop, were you wearing a body camera?

7    A.   Yes.

8    Q.   Was your body camera activated?

9    A.   Yes.

10   Q.   And it was recording?

11   A.   Yes.

12   Q.   Does your body camera truly and accurately record

13   what is in front of the camera?

14   A.   Yes.

15   Q.   Does it truly and accurately record both video

16   and audio?

17   A.   Yes.

18   Q.   I'm approaching you with a white CD that's marked

19   Grand Jury Exhibit Number 2.  I'm handing it to you.  Do

20   you recognize what I have handed to you?

21   A.   Yes.

22   Q.   How do you recognize it?

23   A.   This is my body worn camera footage.

24   Q.   Have you reviewed that CD?

25   A.   Yes, in your office.

1    Q.   Does that CD contain a true and accurate copy of
2    approximately 24 minutes of your body camera recording?
3    A.   Yes.
4              MR. PILLER:   Removing and receiving into
5              evidence Grand Jury Exhibit Number 2.
6    Q.   Officer, was the firearm, the gun that you
7    recovered, was that vouchered in this case?
8    A.   Yes.
9    Q.   What does it mean to voucher property?
10   A.   It's our department's way of itemizing,
11   accounting for property that's recovered during an
12   arrest or other situations, that our department
13   encounters.
14   Q.   In that vouchering process, is property assigned
15   an invoice number?
16   A.   Yes.
17   Q.   And is that a unique number relating to a
18   specific piece of property?  Was the firearm and
19   ammunition given an invoice number in this case?
20   A.   Yes.
21   Q.   Do you recall what that invoice number is?
22   A.   Not off the top of my head.
23   Q.   Would a copy of the property clerk's invoice
24   refresh your recollection?
25   A.   Yes.

G.L.12

1    Q.   I'm handing you a copy of the property clerk's

2    invoice.   Can you tell me when -- if your recollection

3    has been refreshed?

4    A.   Yes.

5    Q.   Can you tell the jury what is the invoice number

6    for the gun and ammunition?

7    A.   Yes, it's Invoice Number 4000937358.

8    Q.   And after you recovered the gun, was it sent to a

9    -- do you know was it sent to a laboratory for testing;

10   whether the gun was operable?

11   A.   Yes.

12   Q.   Was it sent for testing?

13   A.   I'm not sure.   I put in a request for the testing

14   or lab.

15   Q.   You don't have personal knowledge it was sent,

16   that's typically what you do?

17   A.   Yes, I requested that it be sent.   I'm just not

18   sure if it was sent yet.

19   Q.   After you arrested Mr. Chambers, do you collect

20   personal information about someone who is arrested?

21   A.   Yes.

22   Q.   Such as name, date of birth, things like that?

23   A.   Yes.

24   Q.   And did you determine whether Mr. Chambers had a

25   New York State identification number or a NYSID number?

G.L.13

1    A.   Yes.

2    Q.   Did he have one?

3    A.   Yes.

4    Q.   And what is a NYSID number?

5    A.   When someone gets fingerprinted, basically give

6   them a number associated with that person.

7    Q.   That can be fingerprinted for things like a job

8   application, is that right?

9    A.   Yes.

10    Q.   Do you have a NYSID number?

11    A.   Yes.

12    Q.   Do I have a NYSID number?

13    A.   I'm sure, yes.

14    Q.   And to be clear, did you observe whether Mr.

15   Chambers did have a NYSID number?

16    A.   Yes.

17    Q.   Did he have one?

18    A.   Yes.

19    Q.   Do you recall what his NYSID number is?

20    A.   Not off the top of my head.

21    Q.   Would a copy of the arrest report refresh your

22   recollection?

23    A.   Yes.

24    Q.   Handing a copy of the arrest report, please let

25   us know when your recollection has been refreshed.

1      A.    Yes.

2      Q.    What is Mr. Chambers NYSID number?

3      A.    It is 190434K.

4      Q.    And what is his date of birth?

5      A.    Date of birth is 11/15/1988.

6      Q.    Did you eventually test the windows to determine

7    how much they were tinted?

8      A.    No -- yes.

9      Q.    Do you use any kind of device when you do that?

10     A.    Yes, we use a tint meter.

11     Q.    I'm approaching you with a picture that's marked

12   Grand Jury Exhibit Number 3.  Do you recognize what I'm

13   handing you?

14     A.    Yes.

15     Q.    How do you recognize it?

16     A.    This is a photo that I took of a tint meter

17   testing the vehicle that we are talking about, its

18   window tint.

19     Q.    Does that picture truly and accurately reflect

20   the tint meter of the red Jaguar vehicle that you tested

21   as well as the tint meter reading?

22     A.    Say that again.

23     Q.    Does that picture fairly and accurately depict

24   the car that we have been talking about, the red

25   Jaguar's window, and the tint meter as well as the

1    reading on the tint meter?

2        A.    Yes.

3                MR. PILLER:    Removing and receiving into

4            evidence Grand Jury Exhibit Number 3.

5        Q.    Can you tell us how does that tint meter work?

6    How do you read the tint meter?

7        A.    So it gives a light transmittance basically

8    saying how much light is allowed through and gives off

9    the number on there.  Basically, slide on the window to

10   get a reading how dark or how light the window tint

11   actually is.

12       Q.    What was the reading on the tint meter when you

13   tested it?

14       A.    Twenty-two.

15       Q.    Did you test all of the windows on the car?

16       A.    All but the driver window.

17       Q.    Did all the windows read 22?

18       A.    No, I think the other two might have read a

19   different number.

20       Q.    Do you recall what that number was?

21       A.    I think it was 26.  I have to check to be sure.

22       Q.    In the 20s?

23       A.    In the 20s, yes.

24       Q.    So the reading of 22 does that mean 22 percent of

25   light is able to pass through the window?

1    A.    Yes.

2              MR. PILLER:  At this time it's 12:55.  I

3          think we are going to stop for lunch.  Officer,

4          you can step down for now.

5              JUROR:  He stated that he attempted to give

6          him a registration; however, he did not receive

7          one.  What does he mean by attempted, the

8          officer?

9              MR. PILLER:  So it's a question from the

10         witness.

11             JUROR:  Yes.

12             MR. PILLER:  So briefly, we'll continue this

13         witness's testimony later this afternoon.  So

14         hold your questions until the end and we'll ask

15         those questions when we return this afternoon.

16         Thank you.

17             For now we're breaking for lunch.  Officer,

18         will you step down first.

19             (WITNESS EXCUSED)

20

21             MR. PILLER:  At this time, we're going to

22         continue the case to later this afternoon.  Any

23         questions you have about -- questions you have

24         for the witness or any questions you have about

25         the law, you can ask those questions at the end.

G.L.17

1          For now we are going to break.  In the meantime,

2          please do not discuss or deliberate on this case

3          until I have had an opportunity to present

4          additional evidence and charge you on the law.

5              Thank you.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              POLICE OFFICER JOSEPH KEEGAN,

2    was recalled as a witness, having previously been duly

3    sworn, testified further as follows:

4    BY MR. PILLER:

5              MR. PILLER:  Madam Foreperson, would you

6         please remind the witness he is still under oath.

7              FOREPERSON:  Officer, you are still under

8         oath.

9              MR. PILLER: You are under the same oath

10        that you took earlier this afternoon.

11             THE WITNESS:  Yes.

12   Q.   Officer, I want to direct your attention back to

13   the incident you testified about earlier on October 19,

14   2022, between 8:45 p.m. and 9:04 p.m. in Queens County.

15   After you arrested Koran Chambers, was an arrest number

16   assigned to that arrest?

17   A.   Yes.

18   Q.   Do you recall what that arrest number was?

19   A.   Not off the top of my head.

20   Q.   Would a copy of the complaint refresh your

21   recollection of the arrest number?

22   A.   Yes.

23   Q.   Handing you a copy of the complainant, please let

24   me know when your recollection has been refreshed.

25   A.   Yes.

```
 1    Q.   What is the arrest number in this case?
 2    A.   It is Q22633436.
 3              MR. PILLER:  I am holding in my hand a
 4         one-page document that I have marked as Grand
 5         Jury Exhibit Number 4.  Reading from the
 6         document:  New York City Police Department Police
 7         Laboratory Firearms Analysis Laboratory Report.
 8         Invoice number 4000937358.  Defendant Koran
 9         Chambers.  At the bottom there is a
10         certification:  I hereby certify that I
11         tested/examined/analyzed the above described
12         items and that this report is an original report
13         made by me. False statements made herein are
14         punishable as a Class A misdemeanor pursuant to
15         Section 210.45 of the New York State Penal Law.
16         It is signed by Officer Didonato.  Tax number
17         948888.  Date prepared October 24, 2022.
18              We are moving and receiving into evidence
19         Grand Jury Exhibit Number 4.  Reading from the
20         document in pertinent part:  Type of analysis:
21         Firearms examination.  Invoice item one, pistol
22         380 auto caliber semi-automatic Glock model 42.
23         Item number two, case cartridge 380 auto caliber
24         Winchester jacketed hollow point.  Item three,
25         magazine 380 caliber auto caliber, capacity 6.
```

J.P.22

1        Invoice item number four, case cartridge 380
2        caliber Winchester jacketed hollow point.
3        Results of examination/analysis:  Pistol was test
4        fired utilizing submitted and laboratory
5        ammunition.  Pistol and the utilized submitted
6        ammunition were found be operable.
7            I am holding a one-page document marked as
8        Grand Jury Exhibit Number 5.  It is a fingerprint
9        analysis.  There is a certification at the
10       bottom:  This report consists of one page.   It
11       is hereby certified that it is a true and
12       unaltered copy transmitted and certified by
13       Kimberly Tomlinson.
14           Moving and receiving into evidence Grand
15       Jury Exhibit Number 5.  Reading from the
16       document:
17           I hereby certify that I am employed by the
18       New York State Division of Criminal Justice
19       Services, the Division, and that I am a public
20       servant, Identification Specialist II, charged
21       with the custody of official fingerprint records,
22       in that I am assigned to the State Identification
23       Bureau, which serves as the State's central
24       repository of fingerprint cards and criminal
25       history records.

J.P.23

1          I further certify that the fingerprint

2     impressions recorded on the arrest fingerprint

3     card maintained by the Division, bearing the

4     following information:

5          NAME: CHAMBERS, KORAN.

6          NYSID: 00190434K.

7          DATE OF ARREST: 10/19/22.

8          ARREST NUMBER: Q22633436.

9          Were compared by me with the fingerprint

10    impressions recorded on the arrest fingerprint

11    card maintained by the Division, bearing the

12    following information:

13         NAME: CHAMBERS, KORAN.

14         NYSID: 00190434k.

15         DATE OF ARREST: 4/18/13.

16         ARREST NUMBER: Q13623021.

17         I determined from my comparison of the

18    fingerprint impressions, recorded on the above

19    arrest fingerprint cards, that the fingerprint

20    impressions are those of the same individual.

21         There is the signature of Kimberly M.

22    Tomlinson, Identification Specialist II.  Dated

23    October 25, 2022.

24         I am holding in my hand a two-page document

25    marked as Grand Jury Exhibit Number 6.  It is a

J.P.24

```
 1          Certificate of Disposition. There is a
 2          certification:  I hereby certify that it appears
 3          from an examination of the records on file in
 4          this office that on January 9, 2014, the
 5          above-named defendant was convicted of the crimes
 6          below.  At the bottom it states in witness
 7          whereof, I have hereunto set my hand and affixed
 8          my officia seal on this date, October 24, 2022.
 9          There is the signature of the court clerk with
10          the raised seal of the court.
11              We are moving and receiving into evidence
12          Grand Jury Exhibit Number 6.  Reading from the
13          document in pertinent part:  The People of the
14          State of New York versus Koran Chambers,
15          Defendant.  NYSID number 190434K. Arrest number
16          Q13623021.  Date of arrest April 18, 2013.  Date
17          of birth November 15, 1988.
18              That on February 21, 2014, upon the
19          aforesaid conviction by plea, to Attempted
20          Burglary in the Second Degree, under Penal Law
21          Section 110/140.25-2 the judge sentenced the
22          defendant and sentence was imposed.
23     Q.   Officer, I would like to follow up on your
24     testimony from earlier about the registration.  We had a
25     question from a Grand Juror before we took a break for
```

J.P.25

1    lunch.  When you asked the driver of the vehicle for
2    registration, did they show you any paper registration?
3        A.  No.
4        Q.  And did they indicate that their registration was
5    electronic, where they had an electronic copy?
6        A.  He was trying to show me his electronic copy for
7    his insurance card.
8        Q.  Did you see the registration that he was in the
9    process of showing you?
10       A.  He told me it was on the windshield.
11       Q.  Did he pull up anything on his phone?
12       A.  Not in regards to the registration.
13       Q.  Did he pull up anything on his phone in regards
14   to something else?
15       A.  He was trying to get his insurance up, but I
16   didn't look at it.
17       Q.  Did you charge him with not having registration?
18       A.  No.
19            MR. PILLER:  At this point we are going to
20            publish Grand Jury Exhibit Number 2.  I am
21            putting Grand Jury Exhibit Number 2 into the
22            computer.  I am going to play the file called BWC
23            Keegan.  I have opened the file.
24       Q.  Officer, would you step down for a moment or can
25   you see the screen from there?  Can you see the time

1   stamp?

2      A.  Yes.

3      Q.  On the top right corner there is a date and time

4   stamp for October 19, 2022, at 20:44.  Does that date

5   and time stamp accurately reflect the date and time of

6   this recording?

7      A.  Yes.

8      Q.  And 20:44, would that be 8:44 p.m.?

9      A.  Yes.

10         MR. PILLER: I am going to skip ahead to

11         20:45:27.

12

13         (WHEREUPON, A VIDEO WAS PLAYED FOR THE

14         MEMBERS OF THE GRAND JURY.)

15

16         MR. PILLER:  I am pausing the video at

17         20:46:37.

18      Q.  Officer, was there any license plate on the front

19   of this vehicle that you stopped?

20      A.  No.

21      Q.  Was there any plate on the rear of the vehicle?

22      A.  Yes.

23         MR. PILLER:  I am going to skip ahead in the

24         in video to 20:59:45.

25

J.P.27

1          (WHEREUPON, A VIDEO WAS PLAYED FOR THE

2          MEMBERS OF THE GRAND JURY.)

3

4     Q.   Officer, at this point in this video, do you

5  recall what, if anything, you were doing?

6     A.   Yes. At this point I was running the defendant's

7  Client ID number.

8     Q.   What is a Client ID number?

9     A.   That is the number associated with your driver's

10  license, or if you don't have a driver's license, it

11  gets generated if you were written a ticket or anything

12  like that.

13     Q.   With respect to this investigation, what kind of

14  information were you looking for based on the driver's

15  Client ID number?

16     A.   Just to see if he had a suspended license or if

17  his license was good basically at that point.

18     Q.   Did you get any information when you made that

19  inquiry or that search with the Client ID?

20     A.   At that point no, it wasn't loading for me on my

21  phone.

22     Q.   Was there a problem with the technology?

23     A.   Yes, I believe so.

24          MR. PILLER:  I am going to resume the video.

25

J.P.28

```
 1          (WHEREUPON, A VIDEO WAS PLAYED FOR THE
 2          MEMBERS OF THE GRAND JURY.)
 3
 4          MR. PILLER:  I am pausing the video at
 5          21:02:27.
 6    Q.  Officer, can you describe what just happened or
 7  what just occurred?
 8    A.  While conducting my car stop he was -- when I
 9  first did the car stop, he wasn't sweating, and then
10  throughout the car stop he was profusely sweating.  He
11  was wiping his face, very uneasy.  And when I continued
12  observing him, I could see there was a bulge that looked
13  like it was a firearm poking out from his jeans.  So I
14  asked him what is going on with your jeans down there.
15  He continued -- he didn't answer me, he gave me a look.
16  I frisked that area and I felt a gun.  And then we
17  arrested him and took the gun off him at that point.
18    Q.  Officer, I have no further questions.
19          MR. PILLER:  Do any Members of the Grand
20          Jury have any questions for the witness?
21          JUROR:  Was the gun licensed or registered
22          to the subject or anyone?
23    Q.  Officer, did Mr. Keegan have any gun permit or
24  conceal carry permit?
25    A.  No.
```

1    Q.  Did you do a -- did you or one of the officers

2    search the gun -- do a search of the serial number to

3    determine if it was licensed to anybody?

4    A.  No, we did a search, but it didn't come back as

5    licensed to anyone.

6    Q.  Did the search come back to Koran Chambers?

7    A.  No, I don't believe so.

8         MR. PILLER:  Do any Members of the Grand

9         Jury have any questions?

10        JUROR:  I am a little confused as to the

11        tint, because it looked like the windows were

12        open.  So at what point during the questions are

13        they talking about the percent of tint and legal?

14        I would like to understand that a little bit

15        better, and the term of what percent did he have?

16        Was it illegal tints?  Could you clarify that?

17        MR. PILLER:  Okay.  Is that it?

18        JUROR:  Did they ever found out if the car

19        was his or not?

20        MR. PILLER:  The first question is about the

21        window tints and what percentage is legal or not

22        legal.  That is a legal question, and at the end

23        of all of the evidence, I will instruct you on

24        the law and I will instruct you on the statute

25        section for tinted windows.

```
 1                 The other question was about the vehicle.
 2      Q.   Officer, did you make a determination whether the
 3  vehicle was stolen or not?
 4      A.   Yes.
 5      Q.   And was it stolen?
 6      A.   No, it was not stolen.
 7      Q.   Did the vehicle belong to Mr. Chambers?
 8      A.   Yes, it did.
 9              MR. PILLER:  Are there any other questions?
10              Madam Foreperson, are there any questions
11          for the witness?
12              FOREPERSON:  No.
13              MR. PILLER:  Seeing no hands and hearing no
14          voices, you may step down, Officer.
15
16
17                   (WITNESS EXCUSED)
18
19
20
21
22
23
24
25
```

# JURISDICTIONALLY DEFECTIVE INDICTMENT

I N D I C T M E N T

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K
C O U N T Y   O F   Q U E E N S

----------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

KORAN CHAMBERS - AFO,VFO
DEFENDANT
CR-026148-22QN
NYSID# 00190434K

| FILED: **OCT 3 1 2022**
| INDICTMENT NO. 1844/2022
| IPD - 73253-22

----------------------------------------

| PL 265.03-1B | CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE (1) |
| PL 265.03-3 | CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE (2) |
| PL 265.02-1 | CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE (3) |
| VTL 375-12A-B | OPERATING A MOTOR VEHICLE WITH A TINTED WINDOW (4) |
| VTL 402-1-A | OPERATING, DRIVING OR PARKING A MOTOR VEHICLE WITHOUT PROPER LICENSE PLATES (5) |



DISTRICT ATTORNEY

FIRST COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 19, 2022 IN THE COUNTY OF QUEENS, KNOWINGLY POSSESSED A LOADED PISTOL, WITH INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.


SECOND COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF CRIMINAL POSSESSION OF A WEAPON IN THE SECOND DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 19, 2022 IN THE COUNTY OF QUEENS, KNOWINGLY POSSESSED A LOADED PISTOL,  AND SUCH POSSESSION WAS NOT IN HIS HOME OR PLACE OF BUSINESS.

THE SUBJECT MATTER OF THIS COUNT BEING AN ARMED FELONY AS THAT TERM IS DEFINED IN SECTION 1.20 OF THE CRIMINAL PROCEDURE LAW.

THIRD COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF CRIMINAL POSSESSION OF A WEAPON IN THE THIRD DEGREE COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 19, 2022 IN THE COUNTY OF QUEENS, KNOWINGLY AND UNLAWFULLY POSSESSED A LOADED PISTOL.
THIS ACT CONSTITUTES A FELONY.

FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF OPERATING A MOTOR VEHICLE WITH A TINTED WINDOW COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 19, 2022 IN THE COUNTY OF QUEENS, OPERATED A MOTOR VEHICLE UPON A PUBLIC HIGHWAY, ROAD OR STREET AND THAT WAS CLASSIFIED AS A STATION WAGON, SEDAN, HARDTOP, COUPE, HATCHBACK OR CONVERTIBLE AND HAD A REAR SIDE WINDOW THAT HAD A LIGHT TRANSMITTANCE OF LESS THAN SEVENTY PERCENT.

FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF QUEENS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF OPERATING, DRIVING OR PARKING A MOTOR VEHICLE WITHOUT PROPER LICENSE PLATES COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 19, 2022 IN THE COUNTY OF QUEENS, OPERATED, DROVE OR PARKED A MOTOR VEHICLE ON A PUBLIC HIGHWAY WITHOUT SUCH VEHICLE HAVING A DISTINCTIVE NUMBER ASSIGNED TO IT BY THE COMMISSIONER AND A SET OF NUMBER PLATES ISSUED BY THE COMMISSIONER WITH A NUMBER AND OTHER IDENTIFICATION MATTER IF ANY, CORRESPONDING TO THAT OF THE CERTIFICATE OF REGISTRATION CONSPICUOUSLY DISPLAYED, ONE ON THE FRONT AND ONE ON THE REAR OF SUCH VEHICLE, EACH SECURELY FASTENED SO AS TO PREVENT THE SAME FROM SWINGING AND PLACED, WHENEVER REASONABLY POSSIBLE, NOT HIGHER THAN FORTY-EIGHT INCHES AND NOT LOWER THAN TWELVE INCHES FROM THE GROUND.


MELINDA KATZ
DISTRICT ATTORNEY